# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOAN T. KLOTH-ZANARD,<br>    *Plaintiff*,<br><br>v.<br><br>BANK OF AMERICA and SPECIALIZED LOAN SERVICING<br>    *Defendants*. | No. 3:15-cv-1208 (MPS) |

## RULING ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Joan T. Kloth-Zanard ("Ms. Kloth-Zanard") alleges violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* ("TCPA"), and the Connecticut Creditor's Collection Practices Act, Conn. Gen. Stat. § 36a-648 *et seq.* ("CCPA"), against Defendants Bank of America, N.A. ("BANA") and Specialized Loan Servicing, LLC ("SLS"); she further alleges violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA") as to SLS only. ECF No. 132.[1] BANA and SLS filed motions for summary judgment. ECF Nos. 202 & 204. For the reasons set forth below, the motions for summary judgment are GRANTED.

## I.     Facts

The following facts are taken from the Defendants' Local Rule 56 Statements and the underlying record. Unless otherwise indicated, all facts are undisputed.[2]

---

[1] Ms. Kloth-Zanard initially filed suit on August 7, 2015. ECF No. 1. On February 16, 2016, she filed an amended complaint. ECF No. 17. On June 5, 2018, she filed a motion to amend her February 16, 2016 complaint. ECF No. 132. The Court largely granted this motion, but denied leave to add an FDCPA claim as to BANA, permitting such a claim to move forward only against SLS. ECF No. 177.

[2] Local Rule 56 requires a party moving for summary judgment to file and serve a statement setting forth a concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried. L.R. 56(a)(1). A party opposing a motion for summary judgment must then file and serve a statement which admits or denies each fact contained in the moving party's statement, L.R. 56(a)(2)(i), and may also include additional facts, L.R.

### A. Home Loan and Mortgage

On May 26, 2006, Ms. Kloth-Zanard executed a promissory note ("Note") in favor of

Countrywide Home Loans, Inc. ("Countrywide") in exchange for a home mortgage loan in the

amount of $313,300 related to her property. ECF No. 202-2 at ¶ 1; ECF No. 204-4 at ¶ 1. On the

same day, she executed an Open-End Mortgage Deed ("Mortgage") on the property in favor of

Mortgage Electronic Registration Systems, Inc. ("MERS") as nominee for Countrywide and its

successors and assigns. ECF No. 202-2 at ¶ 2. The Mortgage was recorded on June 13, 2006.

ECF No. 202-2 at ¶ 3.

Ms. Kloth-Zanard executed a Loan Modification Agreement on November 7, 2008, that

adjusted the terms of the Note for a five-year period. ECF No. 202-2 at ¶ 4; ECF No. 202-6 at 2-

3. In her complaint, Ms. Kloth-Zanard alleges that BANA took over her mortgage when it

purchased Countrywide in 2008. ECF No. 132 at ¶¶ 30, 35, 40-41, 43.[3] She also alleges that the

Bank of New York Mellon ("BONY") was assigned the mortgage by MERS in 2015. *Id.* at ¶

83.[4] SLS began servicing the mortgage loan on behalf of BONY on April 16, 2015. ECF No.

---

56(a)(2)(ii). Each material fact set forth in the moving party's statement and supported by the
evidence is deemed admitted unless it is controverted by the non-moving party's statement or the
Court sustains an objection to the fact. L.R. 56(a)(1). A represented party moving for summary
judgment against a self-represented party must also file and serve notice of these requirements on
the self-represented litigant. L.R. 56(b). The represented party must also file and serve copies of
the full text of Rule 56 of the Federal Rules of Civil Procedure and the full text of Local Civil
Rule 56. *Id.* BANA and SLS both complied with these requirements. ECF Nos. 202-18, 204-5.
Despite receiving the notice and the text of the rules, Ms. Kloth-Zanard did not comply with
Local Rule 56. She submitted no Local Rule 56(a)2 statement and no evidence of any kind in
opposition to summary judgment. However, because Ms. Kloth-Zanard is *pro se*, the Court
considers any specific statements in her objections to summary judgment, ECF Nos. 209 & 210,
that rebut the facts set forth by BANA and SLS in their Rule 56 statements. All other facts set
forth by BANA and SLS in their respective Rule 56 statements are admitted.
[3] This claim is from Ms. Kloth-Zanard's operative complaint, as opposed to a Rule 56 statement,
and I include it here as background.
[4] As explained in note 3, this is included as background information.

204-4 at ¶¶ 2-4; ECF No. 204-3 at 7-8. Before that date, BANA had been servicing the loan. ECF No. 204-3 at 7-8. SLS has never held the Mortgage or Note. ECF No. 204-4 at ¶ 3.

SLS informed Ms. Kloth-Zanard that it was the new servicer of her loan by letter dated April 28, 2015. ECF No. 204-4 at ¶ 5; ECF No. 204-3 at 7-8. On April 30, 2015, SLS sent her another letter stating the amount of the debt and the name of the creditor, and that she had thirty days to dispute the debt. ECF No. 204-4 at ¶ 7; ECF No. 204-3 at 10-11. On May 6, 2015, Ms. Kloth-Zanard sent SLS a letter requesting information on "the [i]nvestors of my loan." ECF No. 204-3 at 13; ECF No. 204-4 at ¶ 9. SLS sent her a response letter on May 14, 2015 with the name of the original and current creditors. ECF No. 204-4 at ¶ 10; ECF No. 204-3 at 15-16. On June 16 and June 18, 2015, Ms. Kloth-Zanard sent SLS letters disputing the debt. ECF No. 204-4 at ¶ 11; ECF No. 204-3 at 18, 20. On June 30, 2015, SLS sent Ms. Kloth-Zanard a letter validating the debt. ECF No. 204-4 at ¶ 12; ECF No. 204-3 at 22.

**B. Phone Calls**

**i. BANA**

As detailed below, Ms. Kloth-Zanard identified her residence telephone number ("residence number"), her facsimile machine telephone number ("fax number"), and her mobile telephone number ("cellphone number") in applications and letters she submitted to BANA as well as in phone calls.

Ms. Kloth-Zanard submitted three requests for mortgage assistance on September 25, 2013, November 15, 2013, and June 16, 2014, respectively, and included her residence and cell phone numbers in each of the three applications. ECF No. 202-2 at ¶¶ 11-12, 17; ECF No. 202-10; ECF No. 202-11; ECF No. 202-14. The first of these applications was sent from her fax number and had that number printed on each page. ECF No. 202-2 at ¶ 11; ECF No. 202-10. In

2013, Ms. Kloth-Zanard submitted four letters related to requesting a loan modification based on economic hardship; she included her residence telephone number on each one. ECF No. 202-2 at ¶¶ 9-10, 13-14; ECF No. 202-8; ECF No. 202-9; ECF No. 202-12; ECF No. 202-13. She submitted an additional two letters that included her cell phone number: one disagreeing with the valuation of her property, ECF No. 202-2 at ¶ 18; ECF No. 202-15, and the other setting forth various disputes with BANA, ECF No. 202-2 at ¶ 20; ECF No. 202-16. Ms. Kloth-Zanard also requested call-backs on several occasions. On October 9, 2013, May 21, 2014, and April 17, 2015, BANA called her on her cell phone number and she requested a call back at a later time. ECF No. 202-2 at ¶¶ 16, 19; ECF No. 202-7 at 7, 312, 484 (Exhibit A-4 at BANA-000509, BANA-000814, BANA-000986).

BANA maintains records of actions taken on customer accounts and telephone calls made to and received from customers. ECF No. 202-2 at ¶ 6. BANA states that its records show that it placed 54 telephone calls to Ms. Kloth-Zanard between January 1, 2014 and August 7, 2015.[5] *Id.* However, three of BANA's records for this time period include the following notation: "Varolii Automated Outbound Call." *See* ECF No. 202-7 at 377 (record from February 10, 2014); *id.* at 382 (record from February 3, 2014); *id.* at 389 (record from January 23, 2014). These are not included in BANA's list of 54 calls. BANA's records demonstrate that most of the calls to Ms. Kloth-Zanard involved her requests for a loan modification. ECF No. 202-2 at ¶ 7. During her deposition, Ms. Kloth-Zanard said that calls about loan modification were not part of the case because "[t]hat would be unfair to you guys." ECF No. 203-1 at 16-17.

---

[5] The relevant time period for Ms. Kloth-Zanard's claims regarding phone calls begins in January 2014, *see* ECF No. 132 at ¶ 63, and ends on August 7, 2015, the date she filed suit, ECF No. 1.

BANA states that its records confirm that no calls to any of Ms. Kloth-Zanard's numbers used an artificial or prerecorded voice. ECF No. 202-2 at ¶ 22. Ms. Kloth-Zanard's deposition included the following conversation about calls from BANA:

A. Because it would ring and then say – occasionally and then say please hold on for an operator or please hold on for a second.
Q. So, in other words, excuse me, you're saying that it wasn't a live individual on the phone –
A. No, they got on the phone. A live individual got on the phone.
Q. No, please let me finish the question. What I'm saying is: Initially when these calls came in, you're saying there was not a live individual on the phone, that would happen subsequently?
A. Sometimes.
Q. Sometimes?
A. Most of the time it was a live person calling us.

ECF No. 204-2 at 32; ECF No. 202-2 at ¶ 21.

BANA states that it did not use an automatic telephone dialing system (as that statutory term has been interpreted by the courts) and included the following explanation in its supplemental responses to Ms. Kloth-Zanard's interrogatory:

BANA states that it uses an integrated computer and telephone system including the Aspect UIP calling platform. The system has the capability to create lists of customer phone numbers to be dialed manually by a human customer service representative and also to create lists of customer phone numbers that will be dialed automatically without being manually input by a customer service representative. Each day, the BANA system can identify customer accounts to be contacted for collections, loan modification contacts, and/or other reasons. Customer accounts and their associated phone numbers can be excluded from calling for various reasons, including, but not limited to, legal restrictions by State, customers protected by the bankruptcy automatic stay, and customers who have requested not to be called on a specific phone number. Customer cell phone numbers without prior consent to call from the customer are withheld from automatic dialing and are put on unique calling lists where call attempts are made manually using BANA's calling platform, Aspect UIP.

ECF No. 202-2 at ¶ 23; ECF No. 203-2 at ¶ 9.

Finally, in response to Ms. Kloth-Zanard's interrogatory asking BANA to "provide the name of all business who provided services to the defendants to call the plaintiff," BANA stated that "no business was identified." ECF No. 202-2 at ¶ 29; ECF No. 203-2 at 4.

### ii. SLS

On April 29 and 30, 2015, SLS attempted to make two telephone calls to Ms. Kloth-Zanard, but was unable to reach her because SLS inadvertently called the wrong number. ECF No. 204-4 at ¶ 13; ECF No. 204-2 at 71; ECF No. 204-3 at 3 ¶ 16. Between May 6, 2015, and August 3, 2015, Ms. Kloth-Zanard called SLS directly nineteen times, using two different telephone numbers (203-770-0318 and 203-267-7801). ECF No. 204-4 at ¶¶ 14-15; ECF No. 204-2 at 71; ECF No. 204-3 at 3 ¶ 16. Neither SLS not any other person or entity on SLS's behalf made any telephone calls to Ms. Kloth-Zanard over that period of time. ECF No. 204-4 at ¶ 16; ECF No. 204-2 at 71. The majority of these incoming calls related to her request for a loan modification. ECF No. 204-4 at ¶ 17; ECF No. 204-2 at 71.

SLS made six outgoing telephone calls to Ms. Kloth-Zanard on August 4 and 6, 2015. ECF No. 204-4 at ¶ 18; ECF No. 204-2 at 71; ECF No. 204-3 at 3 ¶ 16. SLS called her at either 203-770-0318 or 203-267-7801 for each of these calls. ECF No. 204-4 at ¶ 19; ECF No. 204-2 at 71. These outgoing telephone calls all related to Ms. Kloth-Zanard's request for a loan modification and were in direct response to her prior incoming telephone calls to SLS. ECF No. 204-4 at ¶ 20; ECF No. 204-2 at 71.

As noted, during her deposition, Ms. Kloth-Zanard said that she did not understand calls about loan modification to be part of the case. ECF No. 204-4 at ¶¶ 25-26. Her deposition included the following statements concerning such calls:

> Q. Right, that's what I'm saying. The representatives which you spoke to about loan modification applications?

A. I've never complained about the phone calls with the loan modifications.

ECF No. 204-2 at 28.

Q. All right. And we've discussed this, and I think you testified and you've represented in court that calls relating to loan modifications have no bearing in this case?
A. Right. Not as far as the TILA – that's – I cannot – that's not fair.
Q. When you say "the TILA," you mean TCPA?
A. Yeah, whatever that is. . .

ECF No. 204-2 at 49.

### C. Inspections of Property

The Mortgage states that the "[l]ender or its agent may make reasonable entries upon and inspections of the Property." ECF No. 202-5 at 6; ECF No. 202-2 at ¶ 27; ECF No. 204-4 at ¶ 30. BANA's records show that its agent, Safeguard Properties, inspected the property on May 14, 2014, January 20, 2015, February 28, 2015, and March 30, 2015. ECF No. 202-2 at ¶ 28. SLS, through its agent, conducted three exterior inspections of the property in May, June, and July 2015 to determine the condition of the property, ECF No. 204-4 at ¶¶ 31-33; ECF No. 204-3 at 3-4 ¶¶ 19-20. During these inspections, individuals left "door hangers" on the property. ECF No. 204-2 at 25, 30-31, 42.

## II.     Legal Standard

The party moving for summary judgment bears the burden of demonstrating "that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the nonmoving

party must do more than assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted). "[T]he burden on the moving party may be discharged by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (internal quotation marks omitted). The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Robinson*, 781 F.3d at 44.

In reviewing the record, the court "must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013). The court may not "make credibility determinations or weigh the evidence . . . [because] [c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (internal quotation marks and citations omitted).

Where one party is proceeding *pro se*, the court reads the *pro se* party's papers liberally and interprets them "to raise the strongest arguments that they suggest." *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015) (internal quotation marks and citation omitted). Nonetheless, "unsupported allegations do not create a material issue of fact" and cannot overcome a properly supported motion for summary judgment. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

III.     **Discussion**

A.  **Telephone Consumer Protection Act ("TCPA")**

The TCPA, in relevant part, makes it "unlawful . . . to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service . . . or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States." 47 U.S.C. § 227(b)(1)(A)(iii). "Thus, to prove that a defendant violated the TCPA in a case involving a cell phone, a plaintiff must establish that (1) the defendant called his or her cell phone, and (2) the defendant did so using an [automatic telephone dialing system] or an artificial or prerecorded voice." *Levy v. Receivables Performance Mgt., LLC*, 972 F. Supp. 2d 409, 417 (E.D.N.Y. 2013). Similar prohibitions exist for calls to residential phone numbers, as the TCPA also makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party." 47 U.S.C. § 227(b)(1)(B).

If the plaintiff meets her burden, the defendant may assert the affirmative defense that it received prior express consent. *Latner v. Mt. Sinai Health System, Inc*, 879 F.3d 52, 54 (2d Cir. 2018) ("Prior express consent is an affirmative defense to liability under the TCPA."); *Levy v. Receivables Performance Mgt., LLC*, 972 F. Supp. 2d 409, 417 (E.D.N.Y. 2013) ("Prior express consent is . . . an affirmative defense to an alleged TCPA violation, for which the defendant bears the burden of proof.") (internal quotation marks omitted); *In the Matter of Rules and Regulations Implementing the Tel. Consumer Protec. Act of 1991*, 23 F.C.C. Rcd. 559, 565 (F.C.C. 2008) ("[W]e conclude that the creditor should be responsible for demonstrating that the consumer provided prior express consent.").

## 1. BANA

BANA argues that it is entitled to summary judgment because (1) Ms. Kloth-Zanard gave express consent to call, ECF No. 202-1 at 5-8, (2) BANA did not use an artificial or prerecorded voice, *id*. at 9-11, and (3) BANA did not use an automatic telephone dialing system ("ATDS"), *id*. at 11-15. Because consent is an affirmative defense, I first address whether there is a genuine dispute of material fact as to BANA's use of an artificial or prerecorded voice or an ATDS.

### a. Artificial or Prerecorded Voice/ATDS

First, BANA argues that Ms. Kloth-Zanard "confirmed in her deposition, when referring generally to all of the calls from BANA, that '[a] live individual got on the phone.'" ECF No. 202-1 at 10. The broader context of this statement is as follows:

> Q. Okay. Why it is that you believe that the purported 104 phone calls were made with an automated dialing system?
> A. Because it would ring and then say – occasionally and then say please hold on for an operator or please hold on for a second.
> Q. So, in other words, excuse me, you're saying that it wasn't a live individual on the phone –
> A. No, they got on the phone. A live individual got on the phone.
> Q. No, please let me finish the question. What I'm saying is: Initially when these calls came in, you're saying there was not a live individual on the phone, that would happen subsequently?
> A. Sometimes.
> Q. Sometimes?
> A. Most of the time it was a live person calling us.

ECF No. 204-2 at 32. In context, Ms. Kloth-Zanard's statement that "[a] live individual got on the phone" modifies her previous statement that some calls would begin with a voice "say[ing] please hold on for an operator or please hold on for a second." *Id*. Indeed, the individual taking her deposition interpreted her response to mean that "[i]nitially when these calls came in . . . there was not a live individual on the phone" and "that would happen subsequently." *Id*. Ms. Kloth-Zanard responded that this would happen "[s]ometimes." *Id*. She also stated, during her deposition, that she received calls that "came in as an auto robot" where the voice on the line

would say "we're such and such, we're calling for such and such, please press 1 to speak to an agent or please press 2 or please press whatever they say." *Id.* at 58.[6] This deposition testimony provides some support for the contention that BANA occasionally used an artificial or prerecorded voice to initiate calls to Ms. Kloth-Zanard.

BANA states that it has submitted records of all calls to Ms. Kloth-Zanard, ECF No. 202-1 at 9-11; ECF No. 212, and that "all calls to Plaintiff's Mobile Number (or any other number) that are shown in BANA's call records, indicate a discussion with Plaintiff by a live individual or a message left for Plaintiff by a live individual." ECF No. 202-1 at 10. To support this argument, BANA states that "entries [in its internal system] show that BANA placed 54 telephone calls to Plaintiff during the time period of January 1, 2014 to . . . August 7, 2015" and identifies these records.[7] ECF No. 202-2 at ¶ 6; *see* ECF No. 202-1 at 10-11; *see, e.g.*, BANA-000542 (record from December 15, 2014 stating that the BANA employee "[s]poke with: Joan Kloth" and "spoke to homeowner"); BANA-000505 (record from April 29, 2015 noting that the BANA employee "[l]eft message with my contact information and hours of operation"). Ms. Kloth-Zanard argues that "BANA falsely claims that their 'call records[] indicate a discussion with plaintiff by a live individual or a message left for the plaintiff by a live individual.'" ECF No. 209 at ¶ 7. Indeed, some records from the relevant time period include the following notation: "Varolii Automated Outbound Call." *See, e.g.*, ECF No. BANA-000884 (record from February 3, 2014); BANA-000891 (record from January 23, 2014). While there is no evidence in the record about what the notation means, these call records referencing "outbound call[s]" are not

---

[6] This statement was made during questioning by Mr. Polansky, SLS's lawyer, but appears to reference calls from the time period when BANA serviced her debt.
[7] While BANA's Rule 56 statement identifies records for 54 telephone calls, ECF No. 202-2 at ¶ 6, its memorandum in support of its motion for summary judgment lists records for 49 calls made during this time period, ECF No. 202-1 at 10-11.

included in the list of 54 in-person calls identified by BANA. The existence of such records, together with Ms. Kloth-Zanard's deposition testimony, raises a genuine issue of material fact as to whether BANA sometimes used an artificial or prerecorded voice to call Ms. Kloth-Zanard.[8]

### b. Consent to Call

As an initial matter, both BANA and Ms. Kloth-Zanard agree that there was consent for all calls related to loan modification. During her deposition, Ms. Kloth-Zanard agreed that calls about loan modification were not part of the case because "[t]hat would be unfair." ECF No. 203-1 at 17. Ms. Kloth-Zanard's TCPA claim therefore stems only from calls about the debt that are unrelated to any of her loan modification applications.

In 2008, the FCC explained "that autodialed and prerecorded message calls to wireless numbers that are provided by the called party to a creditor in connection with an existing debt are permissible as calls made with the 'prior express consent' of the called party." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Protec. Act of 1991*, 23 F.C.C. Rcd. 559, 559 (F.C.C. 2008). And in the context of a debt, "prior express consent is deemed to be granted only if the wireless number was provided by the consumer to the creditor" and "such number was provided during the transaction that resulted in the debt owed." *Id*. at 564–65 (2008).

"[T]he relevant issue in evaluating prior express consent is whether a phone number has voluntarily been provided to the creditor." *Moore v. Firstsource Advantage, LLC*, 2011 WL 4345703, at *10 (W.D.N.Y. Sept. 15, 2011); *see also Rotberg v. Jos. A. Bank Clothiers, Inc.*, 345 F. Supp. 3d 466, 477 (S.D.N.Y. 2018) (explaining that prior express consent "can be satisfied by the simple act of giving one's phone number directly to a caller"). Thus, "[a]lthough the FCC did not define the exact parameters of the phrase 'during the transaction that resulted in the debt

---

[8] It is unnecessary to address BANA's argument about an ATDS, as use of an ATDS is an alternative predicate for TCPA liability.

owed,' a commonsense reading of that phrase does not lead to the conclusion that a phone number must be given at the precise time the account is activated," *Moore*, 2011 WL 4345703, at * 10, or in this case, the precise time the debt is incurred. "[I]t would strain logic to conclude that a debtor's voluntary provision of a contact number at the time an account is opened would constitute prior express consent to be called at that number, but that the equally voluntary provision of a contact number sometime after the account is opened would not." *Id*. (internal quotation marks omitted); *see also In the Matter of Rules and Regulations Implementing the Telephone Consumer Protective Act of 1991*, 23 F.C.C. Rcd. 559, 564 (noting that the legislative history of the TCPA supports a reading that "persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given . . . ," and quoting a House report stating that "[t]he restriction on calls to emergency lines, pagers, and the like does not apply when the called party has provided the telephone number of such a line to the caller for use in normal business communications") (internal quotation marks and footnote omitted).

Of course, when an individual provides her number to a creditor outside the context of a debt, it does not constitute prior express consent. *Nigro v. Mercantile Adjustment Bureau, LLC*, 769 F.3d 804, 806–07 (2d Cir.2014) (holding that the son-in-law of a deceased debtor who contacted a power company to shut down the debtor's account when she died, and in doing so provided his own cell phone number, did not give prior express consent because "he provided his number long after the debt was incurred and was not in any way responsible for—or even fully aware of— the debt"[9]); *Hill v. Homeward Residential, Inc.*, 799 F.3d 544, 551–52 (6th Cir.

---

[9] The *Nigro* Court did not decide whether a person who provided a phone number in connection with a debt after he himself incurred that debt has given prior express consent. *Nigro*, 769 F.3d at 807 n.4 ("Whether a subsequently given phone number is given as part of a continuing

2015) (explaining that the FCC's ruling "emphasizes that creditors can call debtors only to recover payment for obligations owed, not on any topic whatsoever," and "ensures that a debtor who gives his number *outside* the context of the debt has not given his consent to be called regarding the debt") (internal quotation marks, citations, and alterations omitted).

In this case, BANA argues that Ms. Kloth-Zanard gave express consent to contact her at her mobile number, residence number, and fax number. ECF No. 202-1 at 5-8. In support of this argument, BANA submits letters and mortgage assistance applications in which Ms. Kloth-Zanard listed her phone numbers, as well as records of calls in which she requested a call back from BANA. *Id*. at 6-8. BANA points to three requests for mortgage assistance that were submitted on September 25, 2013, November 15, 2013, and June 16, 2014, respectively. ECF No. 202-2 at ¶¶ 11-12, 17; ECF No. 202-10; ECF No. 202-11; ECF No. 202-14. Ms. Kloth-Zanard included her residence and cell phone numbers on each of the three applications. ECF No. 202-2 at ¶¶ 11-12, 17; ECF No. 202-10; ECF No. 202-11; ECF No. 202-14. In addition, the first of these applications was sent from her fax number and had that number printed on each page. ECF No. 202-2 at ¶ 11; ECF No. 202-10. She also submitted four letters related to her request to modify her home loan based on economic hardship and included her residence number on each one. ECF No. 202-2 at ¶¶ 9-10, 13-14; ECF No. 202-8; ECF No. 202-9; ECF No. 202-12; ECF No. 202-13. She submitted an additional two letters that included her cell phone number: one disagreeing with the valuation of her property, ECF No. 202-2 at ¶ 18; ECF No. 202-15, and the other setting forth various disputes with BANA, ECF No. 202-2 at ¶ 20; ECF No. 202-16. Finally, Ms. Kloth-Zanard also requested call-backs on several occasions; on

---

‘transaction,’ or a transaction separate from the initial one that ‘resulted in the debt owed,’ is a question for future courts.”).

October 9, 2013, May 21, 2014, and April 17, 2015, BANA called her on her cell phone number and she requested a call back at a later time. ECF No. 202-2 at ¶¶ 16, 19; ECF No. 202-7 at 7, 312, 484 (Exhibit A-4 at BANA-000509, BANA-000814, BANA-000986).

Because Ms. Kloth-Zanard voluntarily provided her phone numbers to BANA in applications for mortgage assistance, requests for loan modification, and letters discussing loan repayment—all communications related to the underlying debt—she gave prior express consent to calls regarding the debt owed. As noted above, simply because she provided these numbers after she first incurred the debt does not change this analysis. *Moore*, 2011 WL 4345703, at * 10 ("[I]t would strain logic to conclude that a debtor's voluntary provision of a contact number at the time an account is opened would constitute prior express consent to be called at that number, but that the equally voluntary provision of a contact number sometime after the account is opened would not.") (internal quotation marks omitted). To find otherwise would expose BANA to liability for calling her about a debt even after she invited it to call her to discuss modifying the debt's terms.

Ms. Kloth-Zanard does not dispute the fact that she provided her phone numbers to BANA in applications, requests, and letters. Instead, she states that, "[p]er the defendant's own production records, starting at minimum of January 30, 2015, the plaintiff requested they stop calling her" but they "continued to call and harass [her]." ECF No. 209 at ¶ 2. Ms. Kloth-Zanard appears to be referencing a call record from January 30, 2015 containing the following note from a BANA representative:

> [H]omeowner called in to express concern that we are harassing her, not willing to work with her and that she would be obtaining legal counsel to file suit against the bank. I was unable to fully verify the homeowner as she would not allow me to speak and disconnected call promptly. Homeowner requested I no longer call her and did not want to deal with me. Requested any communication be sen[t] in writing. Unable to close out call properly.

ECF No. 202-7 at 16-17, BANA-000518 & BANA-000519.

However, "there is no provision in the TCPA, unlike the FDCPA, *see* 15 U.S.C. § 1692c(c), that allows withdrawal of a voluntarily-given, prior express consent to call a cell phone number." *Saunders v. NCO Fin. Sys., Inc.*, 910 F. Supp. 2d 464, 468 (E.D.N.Y. 2012). Some courts within the Second Circuit have held that consent may be withdrawn as long as the request to withdraw is in writing, *see, e.g.*, *Moore*, 2011 WL 4345703; *Starkey v. Firstsource Advantage, LLC,* 2010 WL 2541756 (Mar. 11, 2010 W.D.N.Y.), but Ms. Kloth-Zanard does not provide any evidence to suggest she ever submitted such a request in writing. In any event, as noted above, Ms. Kloth-Zanard asked BANA to call her back after January 30, 2015. ECF No. 202-7 at 7 (April 17, 2015 request for callback). Indeed, as late as July 14, 2015 – a month before this lawsuit was filed – Ms. Kloth-Zanard faxed a letter to BANA and SLS listing her home telephone number and showing her fax number at the top of the page. ECF No. 202-16 at 2. The letter discussed various disputes with the defendants, including disputes about loan modification and loan payments, but made no mention of phone calls and included no request to stop contacting her. *Id*. at 2-3.

As such, Ms. Kloth-Zanard has not submitted evidence raising a genuine issue of material fact as to the defense of consent, and summary judgment as to the TCPA claim against BANA is GRANTED.

### 2. SLS

SLS argues that it is entitled to summary judgment on the TCPA claim because it made only six outgoing phone calls to Ms. Kloth-Zanard and each call was made by a live SLS employee who manually inputted the phone number. ECF No. 204-1 at 7.

#### a. Artificial or Prerecorded Voice

SLS only began servicing Ms. Kloth-Zanard's loan on April 16, 2015. ECF No. 204-3 at 7-8. Shortly thereafter, on April 29 and April 30, 2015, SLS attempted to reach Ms. Kloth-Zanard, but called the wrong number. ECF No. 208. Then, between May 6 and August 3, 2015, Ms. Kloth-Zanard called SLS nineteen times. ECF No. 204-2 at 71; ECF No. 208. On August 4, 2015, SLS called Ms. Kloth-Zanard three times. ECF No. 204-2 at 71; ECF No. 208. All three of these calls went unanswered and an SLS employee left a message after two of them. ECF No. 208. Then, on August 6, 2016, SLS called Ms. Kloth-Zanard an additional three times. *Id*. One of these calls went unanswered and an SLS employee left a message; Ms. Kloth-Zanard picked up the other two calls and spoke with the SLS employee. *Id*. Audio recordings of these calls confirm that none of them included an artificial or prerecorded voice. *Id*. And an affidavit submitted by Mark McCloskey, Assistant Vice President at SLS, states that the compact disc provided to the Court includes "copies of recordings of *all* telephone calls made by and between SLS and Plaintiff between January 2014 and August 7, 2015." ECF No. 204-3 at 3 ¶ 16 (emphasis added).

Ms. Kloth-Zanard contests these facts, stating that "[b]ased on [her] own phone records and witnesses, it appears that SLS is committing Fraud Upon the Courts by lying about not calling, whether by an individual, using a 3rd Party's or Robo calling to harass the plaintiff." ECF No. 210. During her deposition, she said she received calls that "came in as an auto robot" and the voice on the line would say "we're such and such, we're calling for such and such, please press 1 to speak to an agent or please press 2 or please press whatever they say." ECF No. 204-2 at 58. However, she said such calls from SLS "went on all the way from 2014 forward," despite the fact – undisputed in this record – that SLS did not begin servicing her loans until April 2015. *Id*. Further, when asked whether she was "certain that was SLS," Ms. Kloth-Zanard responded

that it was "SLS and/or its third parties." *Id*. But she has provided no evidence that any third parties who called her were associated with SLS.

Her unsupported statements, in light of the affidavit and the audio files submitted by SLS, do not raise a *genuine* dispute as to the use of an artificial or prerecorded voice by SLS (as opposed to another servicer), especially because she stated that she received such calls before SLS even began servicing her loan.[10]

### b. ATDS

The TCPA defines "automatic telephone dialing system" as "equipment which has the capacity--(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227 § 227(a)(1). The term "capacity" in this definition "should be interpreted to refer to a device's current functions, absent any modifications to the device's hardware or software" and "include[s] devices whose autodialing features can be activated . . . by the equivalent of the simple flipping of a switch." *King v. Time Warner Cable Inc.*, 894 F.3d 473, 481 (2d Cir. 2018) (internal quotation marks omitted).

In this case, Mark McCloskey, an Assistant Vice President at SLS, submitted an affidavit with the following statement:

> Based upon my review of the Servicing Notes and of the electronic telephone recordings, and of SLS's electronic books and records generally, between January 2014 and August 7, 2015, SLS only made the six outgoing calls to Plaintiff . . . and each of those six calls were made by an SLS employee by manually inputting Plaintiff's numbers and not by

---

[10] Ms. Kloth-Zanard also contested the number of calls she made to SLS: "SLS claims plaintiff made 19 calls to them. Their lack of phone records to corroborate this is suspect to fraud upon the courts. In fact, plaintiff was extremely uncomfortable calling SLS without a witness and so had the DOB [Department of Banking] place the majority of the calls between her and SLS." ECF No. 210. In making this statement, Ms. Kloth-Zanard does not recognize that audio files of the 19 calls she made to SLS have been submitted to the Court. *See* ECF No. 208. In any case, the calls she made to SLS are not at issue here.

using an automatic telephone system. . . SLS never used an automatic telephone dialing system to call Plaintiff during this time period.

ECF No. 204-3 at 3 ¶ 17. Ms. Kloth-Zanard has not submitted any evidence to suggest that SLS used an ATDS – a device with the capacity to produce telephone numbers "using a random or sequential number generator" – to call her. When asked during her deposition "why [she] believe[d] SLS may have used an automated dialing system," she said "[b]ecause it came in as an auto robot until you pick up the phone and then you push the button" and she was told to press certain buttons in order to speak with an agent. ECF No. 204-2 at 58. However, as discussed above, it is unclear whether these statements refer to calls from SLS, as Ms. Kloth-Zanard stated that she received such calls before SLS began servicing her loans. Moreover, even if the voice on the calls asked her to take steps to speak with an agent about her debt, that would not support the claim that she was called from a device with the capacity "to store or produce telephone numbers . . . using a random or sequential number generator," as the statute requires. 47 U.S.C. § 227(a)(1); *see ACA Intl. v. Fed. Commun. Commn.*, 885 F.3d 687, 693 (D.C. Cir. 2018) (explaining that an ATDS must have the capacity to store or produce telephone numbers using a random or sequential number generator) (internal quotation marks omitted). Ms. Kloth-Zanard's statements, without more, are insufficient to support a reasonable inference that SLS used an ATDS.

In sum, SLS has submitted affidavits and audio files showing that it called Ms. Kloth-Zanard only six times in the relevant timeframe, that each of these calls was made by a live person, and that an ATDS was not used at any time. Ms. Kloth-Zanard has not submitted

evidence raising a genuine dispute as to any of these facts. Therefore, summary judgment as to the TCPA claim against SLS is GRANTED.[11]

## B.  Connecticut Creditors Collections Practices Act ("CCPA")

The CCPA states that "[n]o creditor shall use any abusive, harassing, fraudulent, deceptive or misleading representation, device or practice to collect or attempt to collect any debt." Conn. Gen. Stat. Ann. § 36a-646. The Commissioner of Banking may adopt regulations "specifying those acts which are deemed to be in violation of section 36a-646." Conn. Gen. Stat. Ann. § 36a-647(a). Regulation § 36a-647-5 provides that a creditor "shall not engage in any conduct the natural consequence of which to a reasonable person would be to harass or abuse such person in connection with the collection of a debt" and sets forth conduct which violates this section. Regs. Conn. St. Agencies §  36a-647-5. In addition, "[f]or a plaintiff to have a viable claim under the CCPA, she must present some evidence of harm because of the defendant's actions." *Dina v. Cuda & Associates*, 950 F. Supp. 2d 396, 406 (D. Conn. 2013). Finally, a plaintiff must also bring suit "not later than one year after the date on which the violation occurs." Conn. Gen. Stat. Ann. § 36a-648(d). Because Ms. Kloth-Zanard's complaint relates back to the filing of her original pleading on August 7, 2015, she may only bring claims for violations occurring on or after August 7, 2014.

### 1.  BANA

Ms. Kloth-Zanard argues that BANA violated the CCPA by calling her with such frequency as to harass her, ECF No. 132 at ¶ 93(j); trespassing on her property, *id.* at ¶ 55; and using false representation or deceptive means to collect a debt, *id.* at ¶ 93(k); ECF No. 209.

---

[11] The Court further notes that there is no genuine dispute that all six calls from SLS to Ms. Kloth-Zanard were related to the loan modification, ECF No. 204-2 at 71-72; ECF No. 208, and that Ms. Kloth-Zanard has repeatedly explained that such calls are excluded from this case, ECF No. 204-2 at 28, 49.

First, regarding the frequency of calls to Ms. Kloth-Zanard, BANA states that its records show 30 calls between August 7, 2014 and August 7, 2015. In her complaint, Ms. Kloth-Zanard states that there were 104 calls, ECF No. 132 at ¶¶ 60, 63, 71(a), 77, but she does not provide any evidence to support this contention, nor does she point to any evidence in BANA's call records to support this contention. And in her deposition, she explained that she estimated the number of calls and was unsure about who in her family received those calls and who made the calls:

> Q. Okay. Where did you come to the number of 104 times from?
> A. I don't remember how I came up with the number at the moment. I used – I probably had some kind of calculation that I used based on information that I have in my files.
> Q. Are those – is there some record that you have of phone calls coming in or going out?
> A. No. I believe it was based on – had to do with something of the weekly and monthly phone calls we were getting.

ECF No. 204-2 at 27.

> Q. . . . Of the 104 calls . . . how many of those were made to you personally?
> A. I don't know.
> Q. Were any of those 104 calls made to your husband?
> A. I don't know.
> Q. Were any of those 104 calls made to your daughter?
> A. I don't know.
> Q. Okay. Were any of those 104 calls made to you?
> A. I'm sure they were.
> Q. Okay. About how many of them?
> A. I don't know.

ECF No. 204-2 at 29.

> A. . . . And I just figured out the 104; it was based on two phone calls a week for one year.
> Q. Okay. So it's an estimate?
> A. It's an estimate.
> [ . . . ]
> A. I estimated about two phone calls a week for one year only.
> Q. For one year?
> A. I think it was one year, maybe it was for two years. It could have been more.

ECF No. 204-2 at 29.

The Court's review of the call records identifies two records between August 7, 2014 and August 7, 2015 – in addition to the 30 identified by BANA – that may indicate phone calls to Ms. Kloth-Zanard. The first of these two is from December 31, 2014 and says "[s]poke with/left message: joan kloth." ECF No. 202-7 at 33, BANA-000535. The second is from April 29, 2015 and says "[l]eft message with my contact information and hours of operation." ECF No. 202-7 at 4, BANA-000506. So there is evidence of, at most, 32 calls from BANA to Ms. Kloth-Zanard between August 7, 2014 and August 7, 2015. Moreover, it appears that some of these calls were related to loan modification – which, as noted, are not part of this case – or were in response to inquiries from Ms. Kloth-Zanard. *See, e.g.*, ECF No. 202-7 at 51, BANA-000553 ("Advise homeowner I was calling to inform that I did receive her letter via email, message on not accepting HAMP mod and requesting a modification with 2% fix for life of loan."); ECF No. 202-7 at 60, BANA-000562 ("Advise homeowner I was calling on concerns we received and message she left. Homeowner advise main concern that she wants a modification that has a fix rate and wont adjust at a later time."). Even if there were 32 calls during this time period about issues *unrelated* to loan modification, it would not raise a triable issue of fact. *Chavious v. CBE Group, Inc.*, 2012 WL 113509, at *2 (E.D.N.Y. Jan. 13, 2012) (noting that "[c]ourts have awarded defendants summary judgment where the volume and pattern of calls demonstrates an intent to contact debtors rather than an intent to annoy, abuse, or harass them," and granting summary judgment where there were "thirty-six calls over approximately two months, all made at reasonable times and not one immediately following another").[12]

---

[12] *Chavious* concerns an analogous provision in the FDCPA that states a "debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." 15 U.S.C. § 1692d. "The CCPA's terms are substantially parallel to the FDCPA," *Vallecastro v. Tobin, Melien & Marohn*, 2014 WL 7185513, at *5 (D. Conn. Dec. 16, 2014), and the CCPA has been described as "a version of the [FDCPA]," *Vasquez v. Karjanis & Sons Motors, LLC*, 2012 WL 6965392, at *10 (Conn. Super.

Second, regarding entries onto her property, Ms. Kloth-Zanard alleged in her complaint that "[n]o less than 6 times in one year, [BANA] trespassed upon our property or sent an agent on their behalf to place illegal notices at our front door." ECF No. 132 at ¶ 55. She further alleged that "[t]hese notices stated they were going to foreclose and that Plaintiff needed to contact them, when in fact Plaintiff was still in the loan modification application process each and every time." *Id.* BANA has submitted evidence that there were inspections of the property on May 14, 2014, January 20, 2015, February 28, 2015, and March 30, 2015.[13] ECF No. 202-1 at 17. BANA also submitted the mortgage, which provides that the "[l]ender or its agent may make reasonable entries upon and inspections of the [p]roperty." ECF No. 202-5 at 6. During her deposition, Ms. Kloth-Zanard testified about entries onto the property and door hangers as follows:

> A. There were so many of them. The one that sticks out in my mind is the one where the guy drove through the driveway, threatened my husband, and then he came back through the driveway in his car again with somebody in his car threatening my husband again. My husband had to go back in the house to get his gun, he was that terrified.
> [. . .]
> A. I don't remember the date at all. I probably maybe documented the date. . . And we had people standing outside of the property on many occasions. I don't remember dates. And attempting to come on the property and us telling them to get off, notices being left on our door when we weren't home, or coming to the door knocking on the door, and I look out the door and I don't recognize the person, I'm alone, I'm not answering the door, sorry.

ECF No. 204-2 at 30-31.

> A. Yeah, they came to the door, knocked on the door, I wouldn't open the door. They left one of their little hanger things on the door telling me we were under foreclosure and that we have to call them.
> Q. What does this notice look like?

---

Ct. Dec. 21, 2012). Accordingly, "courts often consider and cite as persuasive authority cases decided under the federal [FDCPA] because the CCPA parallels the FDCPA." *Claude v. Wells Fargo Home Mortg.*, 2014 WL 4073215, at *7 n.5 (D. Conn. Aug. 14, 2014) (quotation marks and citation omitted).

[13] The May 14, 2014 inspection occurred before August 7, 2014, and therefore falls outside the statute of limitations. Conn. Gen. Stat. Ann. § 36a-648(d).

A. It's a yellow door hanger. Yellow, orange, school bus color, whatever you call that.
Q. You did not keep any of those?
A. I kept a few of them.
Q. So do you still have possession of those?
A. A few of them, I do have.

ECF No. 204-2 at 31.

Q. So for the door knockers, though, it doesn't say anything about paying a debt. Right?
A. No. When you call up, they tell you it's a debt collection.
Q. Okay. But just focusing on the door hanger?
A. No. It's – no. It isn't until you call, and that's when you know what it is.

ECF No. 204-2 at 42.[14]

Ms. Kloth-Zanard's deposition testimony is insufficient to raise a material dispute of fact because the mortgage permitted entry onto the property and there is no evidence to suggest that BANA's representatives acted in an abusive, threatening, or harassing manner, or even that their conduct was not a "reasonable entr[y]" within the meaning of the mortgage agreement.[15] *Bank of New York Mellon v. Worth*, 2016 WL 1048742, at *10 (D. Conn. Mar. 14, 2016) ("Because they were expressly contemplated by the mortgage agreement, [the defendant's] actions—entering onto the property to assess its value and leaving a notice on the front door—could not be

---

[14] This testimony was in response to questioning from Mr. Polansky, who is representing SLS in this matter, but appears to relate to door hangers that Ms. Kloth-Zanard alleges came from both BANA and SLS.

[15] As noted above, Ms. Kloth-Zanard testified during her deposition that a "guy drove through the driveway, threatened [her] husband, and then he came back through the driveway in his car again with somebody in his car threatening my husband again." ECF No. 204-2 at 30. However, this appears to be inadmissible hearsay that does not fall within any of the exceptions set forth in the Federal Rules of Evidence: Ms. Kloth-Zanard appears to be testifying to what her husband told her and his statements are being offered for their truth. Even if Ms. Kloth-Zanard observed this incident and was speaking from her own recollection of it, she was unable to say when it happened, and did not explain why she believed the person to be from BANA or how he threatened her husband. She has submitted no evidence on these points. *See Robinson*, 781 F.3d at 44 (explaining that the non-moving party "must come forward with *specific* evidence demonstrating the existence of a genuine dispute of material fact") (emphasis added) (quoting *Brown v. Eli Lilly & Co.,* 654 F.3d 347, 358 (2d Cir.2011)).

considered or reasonably perceived as abusive, harassing, fraudulent, or misleading. The notice [the defendant's] agents posted on her door did not threaten [the plaintiff] in any way, nor did [the defendant] post it in a harassing manner, such as posting multiple notices or repeatedly posting them after they were removed. No reasonable juror could find that [the defendant's] actions fit within either the CCPA's or the listed regulations' prohibitions."); *Malick v. J.P. Morgan Chase Bank, N.A.*, 2016 WL 2858772, at *9 (D. Conn. May 16, 2016) (dismissing a CCPA claim after a bench trial because "the conduct undertaken by Defendant . . . , including changing the locks, putting vacancy notices on the property, and sending letters to [the plaintiff] to confirm whether or not the property was abandoned, was contemplated under the mortgage agreement"); *Cohen v. Ditech Fin., LLC*, 342 F. Supp. 3d 460, 468 (S.D.N.Y. 2018) (stating that leaving a doorhanger on the plaintiff's doorknob "is not as a matter of law enough needed to hold the Defendant liable for a violation of the FDCPA.").

Finally, Ms. Kloth-Zanard argues that BANA used "false representation or deceptive means to collect a debt." ECF No. 132 at ¶ 93(k). In support of this argument, she states that between November 2008 and November 2013, BANA collected her mortgage payments while Countrywide was shown as the debt owner on the land records, ECF No. 209 at ¶ 9-13, that "on December 1, 2013, [BANA] put the plaintiff back into the illegal outlawed Predatory Option Arm," *id.* at ¶ 14, that BANA "stalled the loan modification process," *id*. at ¶ 15, and "from 2008-2013 . . . served [her] illegal notices of Acceleration to Foreclosure," *id*. at ¶ 18.

Each of these allegedly-fraudulent practices, with the exception of those concerning the loan modification process, arises out of conduct occurring before August 7, 2014, and is therefore barred by the statute of limitations. Conn. Gen. Stat. Ann. § 36a-648(d) ("An action to enforce liability under this section may be brought in any court of competent jurisdiction not

later than one year after the date on which the violation occurs."). Ms. Kloth-Zanard states, in her complaint, that she "did not discover that . . . her rights were violated under FDCPA: 15 USC § 1962 *et seq*. . . . until recently . . . [thereby] toll[ing] the statute of limitations." ECF No. 132 at 3-4 ¶ 9. She then asserts that "disclosure in 2015 of these statutes resulted in a timely and diligent research." *Id*. However, equitable tolling does not apply in this circumstance. Equitable tolling is "[t]he doctrine that the statute of limitations will not bar a claim if the plaintiff, despite diligent efforts, *did not discover the injury* until after the limitations period had expired." *Wiele v. Bd. of Assessment Appeals of City of Bridgeport*, 988 A.2d 889, 896 (Conn. App. 2010) (quoting Black's Law Dictionary (9th Ed. 2009)) (emphasis added). Equitable tolling does not permit a plaintiff to file suit after the statute of limitations has run because she *did not discover there was an applicable statute*. The statute of limitations "begins to run only after discovery of the facts constituting the violation," *Gallop v. Com. Painting Co., Inc.*, 612 A.2d 826, 829 (Conn. Super. 1992) (internal quotation marks omitted), as opposed to discovery of the laws governing the violation, *Kirwan v. State*, 168 Conn. 498, 502 (Conn. 1975) (explaining that "a person's ignorance that a cause of action exists" does not "save[] him from the operation of limitations"). Here, Ms. Kloth-Zanard has not submitted evidence to demonstrate that she was unaware of the alleged wrongdoing—that BANA took over her mortgage, that the terms of her December 1, 2013 loan were illegal, or that she received notices of acceleration to foreclosure—until after the limitations period expired. As such, equitable tolling is not warranted as to these claims, and they are barred by the statute of limitations.[16]

---

[16] Ms. Kloth-Zanard also states, in her complaint, that the statute of limitations should be tolled because she is "legally disabled with physical and mental health disabilities." ECF No. 132 at 4 ¶ 9(c). Equitable tolling in this context has been explained as follows:

> It is generally held or recognized that a person may be under the legal disability of insanity, or unsoundness of mind, within the meaning of the statute of limitations, when

The record indicates that there was one loan modification process – under the Home Affordable Modification Program ("HAMP") – that occurred after August 7, 2014 and that is thus not barred by the statute of limitations. "To obtain a home loan modification under HAMP, the borrower applying for modification initially provides the lender with required documentation. If the borrower is eligible, the lender reduces the monthly mortgage payment to thirty-one percent of the homeowner's gross monthly income. The homeowner participates in a three-month Trial Period Plan ("TPP"), based on the new mortgage payment." *Thomas v. JPMorgan Chase & Co.*, 811 F. Supp. 2d 781, 787 (S.D.N.Y. 2011). "Following successful completion of the TPP, including final approval by the lender, the lender will permanently modify eligible mortgages." *Id.* at 788. The HAMP itself does not create a private cause of action. *Wheeler v. Citigroup*, 938 F.Supp 2d 466, 471 (S.D.N.Y. 2013).

Ms. Kloth-Zanard states that BANA "refused to work with her and then continued to stall the process of a new loan modification." *Id.* at ¶ 51; *see also id.* at ¶ 80(f)(ii) (stating that BANA engaged in "constant stall tactics and claims about the Plaintiff's submitted paperwork for various Loan Modification Applications when Plaintiff could repeatedly prove appropriate production and submittal of all required documents"); *id.* at ¶ 82 (discussing "stalling of the Loan Modification Process"). She does not point to any specific instances in which BANA used stall tactics, let alone false or deceptive means to collect a debt, in connection with her loan modification efforts. And the Court's own review of the record between August 7, 2014 and August 7, 2015 did not uncover any either. The record does not support a finding that BANA

the disability is of such a nature as to show him (sic) unable to manage his (sic) business affairs or estate or to comprehend his (sic) legal rights or liabilities.
*Ortiz v. Bridgeport Hosp.*, 547104, 2000 WL 1508223, at *3 (Conn. Super. Sept. 27, 2000) (quoting 51 Am.Jur.2d § 187). There is no indication that Ms. Kloth-Zanard has a disability so severe as to prevent her from managing her affairs or understanding her legal rights. Equitable tolling on this basis is therefore unwarranted.

engaged in such practices during the relevant timeframe. Instead, it suggests that BANA worked with Ms. Kloth-Zanard, but that she failed to make the required trial payments for a HAMP loan. *See, e.g.*, ECF No. 202-7 at 73 (October 22, 2014 record stating that the BANA representative "call[ed] to inform homeowner had qualified for trial payment"); ECF No. 202-7 at 51 (December 1, 2014 record stating that the BANA representative "[a]dvise[d] homeowner [he/she] was calling to inform that [he/she] did receive her letter via email, message on not accepting HAMP mod and requesting a modification with 2% fix for life of loan" and "advise homeowner [they] would be looking into this request"); ECF No. 202-7 at 34 (December 29, 2014 record stating that there was a "Missing Trial Payment" and "Trial Payment Letter mailed on: 12/23/2014"); ECF No. 202-7 at 33 (December 31, 2014 record stating that BANA was "waiting for homeowner to make trial payment"); ECF No. 202-7 at 20 (January 22, 2015 record noting that Ms. Kloth-Zanard "was offered a HAMP trial modification and failed to make any payments"). In addition, during a call between a BANA representative and a representative of Ms. Kloth-Zanard from the Urban League, the BANA representative explained that Ms. Kloth-Zanard had declined to accept the HAMP trial that was offered to her. ECF No. 212 at BANA-002088.wav at 3:30 to 5:40.

The motion for summary judgment as to the CCPA claim against BANA is therefore GRANTED.

### 2. SLS

SLS argues that it is not a "creditor" and may not be held liable under the CCPA. ECF No. 204-1 at 11-12; Conn. Gen. Stat. Ann. § 36a-646 (providing that no "*creditor* shall use any abusive, harassing, fraudulent, deceptive or misleading representation, device or practice to collect or attempt to collect any debt") (emphasis added). The CCPA defines "creditor" as "(A)

any person to whom a debt is owed by a consumer debtor and such debt results from a transaction occurring in the ordinary course of such person's business, or (B) any person to whom such debt is assigned." *Id*. at § 36a-645. It further explains that the term "creditor" "shall not include a consumer collection agency." *Id*. A consumer collection agency is defined, for purposes relevant here, as "any person . . . engaged as a third party in the business of collecting or receiving payment for others on any account, bill or other indebtedness from a consumer debtor." Conn. Gen. Stat. Ann. § 36a-800(3).

SLS argues that it is the servicer of Ms. Kloth-Zanard's mortgage loan, ECF No. 204-4 at ¶¶ 2-5, rather than a creditor. SLS submitted an affidavit from Mark McCloskey, an Assistant Vice President of SLS, stating that "SLS is the servicer" of the loan. ECF No. 204-3 at ¶ 5. In addition, the Notice of Servicing Transfer that was sent to Ms. Kloth-Zanard on April 28, 2015 refers to SLS as the "new servicer." ECF No. 204-3. Another letter sent to Ms. Kloth-Zanard on April 30, 2015 lists the creditor as "The Bank of New York Mellon FKA The Bank of New York" and states that SLS is a "debt collector." ECF No. 204-3. A letter sent on May 14, 2015 in response to an inquiry by Ms. Kloth-Zanard lists the current creditor as "The Bank of New York Mellon FKA The Bank of New York," and explains again that "SLS is the servicer of the loan." ECF No. 204-3.

Ms. Kloth-Zanard has not submitted any evidence to suggest that SLS is a creditor. Rather, during her deposition, she agreed that SLS was a servicer of her loan:

> Q. You said earlier that you were now aware of who the investor is for this loan or the owner of the loan. Is that right?
> A. Uh-huh, correct.
> Q. You said earlier that you were now aware of who the investor is for this loan or the owner of the loan. Is that right?
> A. Uh-huh.
> Q. And you're aware – you would agree with me it's not SLS. Right?
> A. Yeah. You're the servicer. Is that what you call –

ECF No. 204-2 at 59.

Ms. Kloth-Zanard has not submitted any evidence raising a genuine dispute of material fact as to SLS's status as a servicer, and "no liability can attach" under the CCPA where the defendants are not "creditors" under the CCPA. *Vallecastro v. Tobin, Melien & Marohn*, 2014 WL 7185513, at *5 (D. Conn. Dec. 16, 2014) (dismissing CCPA claims against loan servicer's employee). Summary judgment as to the CCPA claim against SLS is therefore GRANTED.

### C. Fair Debt Collection Practices Act ("FDCPA")

Ms. Kloth-Zanard's remaining claim is an FDCPA claim against SLS. To prove a violation of the FDCPA, a plaintiff must show that (1) she is "a 'consumer' who allegedly owes the debt or a person who has been the object of efforts to collect a consumer debt, . . . (2) the defendant collecting the debt is . . . a 'debt collector,' and (3) the defendant has engaged in any act or omission in violation of FDCPA requirements." *Cohen v. Ditech Fin., LLC*, 342 F. Supp. 3d 460, 465 (S.D.N.Y. 2018) (internal quotation marks and citation omitted).

Ms. Kloth-Zanard alleges that SLS violated four provisions of the FDCPA. ECF No. 132 at 15. First, she alleges a violation of 15 U.S.C. § 1692c(a), which prohibits, in part, a debt collector from communicating with a consumer in connection with the collection of any debt without the prior consent of the consumer "at any unusual time or place or a time or place known or which should be known to be inconvenient to the consumer." ECF No. 132 at 16. Second, she alleges a violation of 15 U.S.C. § 1692d(5), which prohibits a debt collector from "[c]ausing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number." ECF No. 132 at 16. Third, she alleges a violation of 15 U.S.C. § 1692e(2)(A), which prohibits a debt collector from falsely representing "the character, amount, or legal status of any debt." ECF No. 132 at 17. And

fourth, she alleges a violation of 15 U.S.C. § 1692g(b), which provides, in part, that "[i]f the consumer notifies the debt collector in writing within the thirty-day period . . . that the debt, or any portion thereof, is disputed, or that the consumer requests the name and address of the original creditor, the debt collector shall cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of a judgment, or the name and address of the original creditor, and a copy of such verification or judgment, or name and address of the original creditor, is mailed to the consumer by the debt collector." ECF No. 132 at 17.

Ms. Kloth-Zanard alleges that SLS violated the first three of these provisions by repeatedly calling her without consent. ECF No. 132 at ¶¶ 54, 60, 77, 78, 80(e), 80(f). The undisputed record evidence indicates that SLS called Ms. Kloth-Zanard three times on August 4, 2015; all three calls were unanswered and an SLS employee left messages after two of them. ECF No. 208. The evidence shows that SLS called Ms. Kloth-Zanard an additional three times on August 6, 2015; an SLS employee left a message after one call and spoke with Ms. Kloth-Zanard twice. ECF No. 208. This suggests an intent to contact Ms. Kloth-Zanard rather than to annoy or harass her. *Chavious*, 2012 WL 113509, at *2 (noting that "[c]ourts have awarded defendants summary judgment where the volume and pattern of calls demonstrates an intent to contact debtors rather than an intent to annoy, abuse, or harass them," and granting summary judgment where there were "thirty-six calls over approximately two months, all made at reasonable times and not one immediately following another"). Further, the audio recordings of the three messages that SLS representatives left Ms. Kloth-Zanard and the two phone calls that SLS representatives made to Ms. Kloth-Zanard contain no evidence of intent to harass or annoy Ms. Kloth-Zanard. ECF No. 208. These audio recordings further confirm that calls by SLS

representatives to Ms. Kloth-Zanard were made in response to Ms. Kloth-Zanard's own calls and requests regarding loan modification. ECF No. 208. Six phone calls over the course of two days in response to Ms. Kloth-Zanard's own outgoing calls are insufficient to raise a genuine dispute of material fact that the calls were made with "intent to annoy, abuse or harass" in violation of 15 U.S.C. § 1692d(5). Additionally, Ms. Kloth-Zanard points to nothing "false, deceptive, or misleading" about SLS's calls to her. 15 U.S.C. § 1692e. Nor does she point to any evidence that the calls were made at an "unusual time or place" or one "known to be inconvenient to her" in violation of 15 U.S.C. § 1692c(a).

Ms. Kloth-Zanard also alleges that SLS violated the FDCPA by "sen[ding] a strange man onto our property armed with a camera and against trespassing onto our property." ECF No. 132 at ¶ 61. Indeed, SLS has submitted evidence that it conducted three exterior inspections of the property in May, June, and July 2015 to determine the condition of the property. ECF No. 204-4 at ¶¶ 31-33; ECF No. 204-3 at ¶¶ 19-20. During her deposition, and as discussed above, Ms. Kloth-Zanard stated that the inspectors would leave door hangers on her door. ECF No. 204-2 at 31, 42.[17] As discussed above, however, the mortgage provides that the "[l]ender or its agent may make reasonable entries upon and inspections of the [p]roperty." ECF No. 202-5 at 6. As such, entries onto the property and the leaving of door hangers are insufficient to hold SLS liable for a violation of the FDCPA. *Cohen, LLC*, 342 F. Supp. 3d at 468 (stating that leaving a doorhanger on the plaintiff's doorknob "is not as a matter of law enough . . . to hold the Defendant liable for a violation of the FDCPA"); *Worth*, 2016 WL 1048742, at *10 (noting that, in the analogous

---

[17] As discussed above, during her deposition, Ms. Kloth-Zanard discusses an incident in which her husband felt threatened by an individual conducting an inspection. This statement appears to be inadmissible hearsay and, even if not hearsay, is too vague to raise a genuine dispute of fact. *See* note 15. Further, Ms. Kloth-Zanard has submitted no evidence that the individual was associated with SLS.

CCPA context, actions contemplated by the mortgage agreement such as "entering onto the property to assess its value and leaving a notice on the front door," "could not be considered or reasonably perceived as abusive, harassing, fraudulent, or misleading"). Because the entries were authorized by the terms of the mortgage to which she agreed, there is no evidence that their "natural consequence" was to "harass, oppress, or abuse" Ms. Kloth-Zanard in connection with the collection of a debt. 15 U.S.C. § 1692d.

Finally, Ms. Kloth-Zanard alleges a violation of 15 U.S.C. § 1692g. This provision of the FDCPA requires a debt collector to send the consumer a written notice (either in an initial communication or within five days of the initial communication) containing the amount of the debt, the name of the creditor, and a statement that the consumer has thirty days to dispute the validity of the debt. 15 U.S.C. § 1692g(b). SLS sent Ms. Kloth-Zanard an initial communication on April 28, 2015. ECF No. 204-3 at 7-8. Two days later, on April 30, 2015, SLS sent another letter to Ms. Kloth-Zanard informing her of the amount of the debt, the name of the current creditor, and that she had 30 days to contest the debt. ECF No. 204-3 at 10-11 (stating that Ms. Kloth-Zanard had thirty days to "dispute the validity of the debt" and to request "the name and address of the original creditor"). Approximately a week later, on May 6, 2015, Ms. Kloth-Zanard sent SLS a letter requesting investor information. ECF No. 204-3 at 13. This letter did not dispute the validity of the debt. *Id*. SLS sent her a response letter on May 14, 2015 with the name of the original and current creditors. ECF No. 204-3 at 15-16. On June 16 and June 18, 2015, Ms. Kloth-Zanard sent SLS letters disputing the debt. ECF No. 204-3 at 18, 20. This was untimely. 15 U.S.C. § 1692g(b). Nevertheless, on June 30, 2015, SLS sent Ms. Kloth-Zanard a letter validating the debt. ECF No. 204-3 at 22; 15 U.S.C. § 1692g(b) (stating that if "the consumer notifies the debt collector in writing within the thirty-day period" that she disputes the

debt, the debt collector must "obtain verification of the debt . . . or the name and address of the original creditor" and mail such information to the consumer). Ms. Kloth-Zanard has not submitted any evidence to suggest that SLS failed to properly respond to her debt dispute letter in violation of 15 U.S.C. § 1692g(b). Nor has she submitted any evidence to suggest that SLS falsely represented the "character, amount, or legal status" of her debt in any of their letters in violation of 15 U.S.C. § 1692e(2)(A).

In sum, Ms. Kloth-Zanard has not submitted sufficient evidence to support a finding by a reasonable juror that SLS committed a violation of the FDCPA. Summary judgment is therefore GRANTED as to the FDCPA claim against SLS.

### D. Third Parties

Throughout her complaint, Ms. Kloth-Zanard asserts that BANA used one or more unnamed third parties to contact her in violation of the TCPA and CCPA. *See, e.g.*, ECF No. 132 at ¶ 75 ("Plaintiff has been harassed and damaged as a result of Defendant [BANA] and its servicers willful violations of the TCPA."); *id*. at ¶ 85 ("[BANA] has provided the Plaintiff's private information to additional loan servicers without her express permission not knowledge."). In response to Ms. Kloth-Zanard's interrogatory asking BANA to "provide the name of all business who provided services to the defendants to call the plaintiff," BANA stated that "no business was identified." ECF No. 203-2 at 4. BANA further states that Ms. Kloth-Zanard "can offer no evidence to substantiate these claims [about third party callers] and fails to identify who the supposed 'servicers' w[]ere or how they were related to BANA." ECF No. 202-1. Indeed, while Ms. Kloth-Zanard states that third-party harassment "is evidenced by the Plaintiff's witnesses who heard and had to also instruct the 3rd parties to stop calling," ECF No. 209 at ¶ 17, she does not submit affidavits from witnesses or any other evidence to support this claim. *See*

*Celotex Corp.*, 477 U.S. at 325 (explaining that the burden on the moving party may be discharged by showing "that there is an absence of evidence to support the nonmoving party's case").

As such, summary judgment as to any claims against BANA arising out of allegations concerning calls by third parties is GRANTED.

## IV.     Conclusion

For the reasons set forth above, the motions for summary judgment, ECF No. 202 & 204, are GRANTED.


IT IS SO ORDERED.

/s/  MICHAEL P. SHEA
Michael P. Shea, U.S.D.J.


Dated:          Hartford, Connecticut
                April 30, 2019